## VELTMAN v. MALLICK.

1. APPEAL AND ERROR—NONJURY CASES—WEIGHT OF EVIDENCE—SUPREME COURT.

In nonjury cases the trial judge is the trier of the facts and may give such weight to the testimony as in his opinion it is entitled to and the Supreme Court will not reverse unless the evidence clearly preponderates in the opposite direction.

2. SALES—APPLES—QUALITY—NONJURY CASE—FINDING OF COURT—EVIDENCE.

In suit to recover the purchase price of apples, evidence supported finding that plaintiff was entitled to recover the full purchase price because the apples were of the required grade when placed in defendant's crates and notice given to defendant to pick them up, notwithstanding testimony was conflicting.

REFERENCES FOR POINTS IN HEADNOTES
[1] 3 Am. Jur., Appeal and Error, § 896.

Appeal from Kent; Brown (William B.), J. Submitted October 12, 1948. (Docket No. 84, Calendar No. 44,177.) Decided November 12, 1948.

Assumpsit by Herbert S. Veltman against Alexander K. Mallick, individually and doing business as A. K. Mallick Co., for price of apples purchased. Judgment for plaintiff. Defendant appeals. Affirmed.

*Searl, White & Brooks,* for plaintiff.

*Leo J. Henry* (*Samuel H. Himelstein,* of counsel), for defendant.

NORTH, J. Plaintiff, in a suit tried by the court without a jury, recovered $1,816 as the purchase price of apples sold by plaintiff to defendant, and defendant has appealed. Primarily the defense urged is that the judgment was against the preponderance of the evidence.

On plaintiff's farm there is a 25-acre apple orchard, about five acres of which consists of Wealthy apple trees. In September, 1947, defendant purchased plaintiff's apples which graded U. S. No. 1, Early Wealthies. They were to be sorted by plaintiff into two sizes, one size being not less than $2\frac{1}{2}$-inch diameter and the other not less than $2\frac{1}{4}$-inch diameter. Plaintiff was to pack the apples in crates furnished by defendant, and plaintiff claims defendant was to accept delivery at plaintiff's farm. The price of the $2\frac{1}{2}$-inch apples was $1.60 per crate and of the $2\frac{1}{4}$-inch apples $1.50 per crate. The transaction resulted in there being delivered to defendant and accepted by him 505 crates of the $2\frac{1}{2}$-inch apples. About this portion of the purchase there is no controversy, it being admitted plaintiff should be paid therefor $808. The controversy between the par-

ties pertains solely to the grade of the 2¼-inch apples, of which plaintiff sorted and packed 672 crates. Of these defendant admits 23 crates were acceptable; but as to the remainder of the 672 crates of 2¼-inch apples defendant asserts that because of defects these apples did not grade as U. S. No. 1, Early Wealthies.

The issue narrows down as to whether the 649 crates of 2¼-inch apples were of the required grade when placed in defendant's crates. Plaintiff claims that these apples were properly graded and packed at his farm and there awaited delivery to defendant who was notified and who was to pick them up by truck at plaintiff's farm; and that at that time these apples complied with the U. S. No. 1 grade; and further plaintiff claims if it later developed that some of the apples had deteriorated and did not conform to the required grade this was due to defendant's unreasonable delay in taking possession of the apples and in not properly carrying them in defendant's trucks or not caring for them after they were graded and crated by plaintiff. On the other hand defendant claims that after he had taken these apples in his trucks to his place of business it was discovered that, while they were of the required 2¼-inch diameter, they were defective in other respects and were not of the grade U. S. No. 1; and that the parties had previously agreed defendant's final acceptance of the apples was to be conditioned that upon inspection they were found to be U. S. No. 1 grade.

Plaintiff began picking these apples September 9, 1947. The picking was completed September 25th. Plaintiff began sorting and grading the apples September 15, 1947, and on that day defendant's employees picked up and took to defendant's warehouse 10 crates of the apples. These apples were found to be in an unsatisfactory condition apparent-

ly because "they were badly damaged by bruising, indicating rough handling." No complaint was then made of other defects, such as defendant now assigns in claiming the 2¼-inch apples were not of the required grade. An apple inspector, Mr. Klooster, was sent to plaintiff's farm. This inspector observed the sorting and grading operations and found the apples were being carefully and properly handled. Thereafter defendant's employees rather promptly picked up the 2½-inch apples purchased from plaintiff, but the 2¼-inch apples involved in this controversy were not picked up as promptly by defendant after they were sorted and packed in the crates. Defendant claims it was agreed that the delivery of the 2½-inch apples should have priority, but plaintiff repeatedly urged defendant to to pick up the 2¼-inch apples, and he testified: "I understood they were to pick them up and remove them from our storage as soon as we had a load ready." Of the 2¼-inch apples 400 crates were picked up by defendant on September 26th and the balance of the lot, 249 crates, on October 2d. It would thus appear that 249 crates of the 2¼-inch apples were not removed by defendant from plaintiff's storage house until a little more than three weeks after the picking began; and it also appears from the record that the 400 crates which defendant picked up on September 26th were not inspected by the apple inspector until October 14th, 1947; but the 249 crates picked up by defendant on October 2d seem to have been inspected on the following day.

In a general way the requisites of U. S. No. 1 grade of Early Wealthy apples are indicated by the following. Mr. Wesley Rau, who inspected these apples for defendant, referring to a chart published by the State apple commission and received in evidence, as a witness for defendant, testified:

"Referring to the chart, the qualifications of U. S. No. 1 Early Wealthy apples are that they must be mature, firm, free from scab, worm holes, limb rubs, sunburn, spray burn, decay and such like subject to tolerances in each grade and if marked U. S. No. 1 Early the color doesn't enter into the picture."

Plaintiff, who was experienced in the apple business, testified:

"The U. S. Fancy are the best apples and the U. S. No. 1 are like the Fancy but not so well colored and they probably run somewhat smaller in size. The main things we look for in grading the apples are worms, scabs and bruises. There are 13 requirements for U. S. No. 1 on the chart and I said those were the principal ones.    *    *    *

"In grading U. S. No. 1 apples we picked out all wormy apples that we could see. Some are going to get by the best pickers. Even that grade permits certain discrepancies due to the human element. We looked first for worms, second for scabs and then for any deformed, crippled or damaged apples."

In grading apples a certain tolerance as to non-compliance is permitted. As to such tolerance the witness Klooster, apparently reading from a pamphlet received in evidence, testified:

" 'In order to allow for variations incident to proper grading and handling, not more than a total of 10 per cent. of the apples in any container may be below the requirements of the grade, provided that not more than 5 per cent. shall be seriously damaged by insects and not more than one-fifth of this amount, or 1 per cent. shall be allowed for decay or internal breakdown.' * * * Then it goes on to some other provisions."

As above noted, there is no complaint that any of the apples were under size. In support of plaintiff's contention that at the time the 2¼-inch apples

were sorted and packed in defendant's crates they were U. S. No. 1 grade, there is positive and direct testimony. Plaintiff testified:

"The apples were sound except for coloring (of which no complaint is made) and were well filled, good clean apples. * * * I would not admit that the apples were not No. 1 when I graded them. They were No. 1. In fact he (defendant) sent an inspector to us who O. K'd. the apples and said they were U. S. No. 1. * * * They were U. S. No. 1's when they were graded."

Inspector Klooster, who was in the employ of the Michigan apple commission, testified:

"*Q.* So you had an opportunity to watch them grade them?

"*A.* Yes.

"*Q.* Were they apparently doing everything correctly?

"*A.* I had no criticism to offer. I thought they were handling them very carefully."

Plaintiff's son, Orville Veltman, who assisted in harvesting this crop of apples, testified:

"The 2¼ apples were kept in separate stacks and there were about 600 bushels on the 25th of September. The larger apples moved from the storage and the smaller ones remained until the very end. * * *

"*Q.* As these apples came through the grader what can you say about the condition of the 2¼-inch and the 2½? Were they running about the same or not?

"*A.* When they came through the grader they were exactly the same. All apples had been carefully sorted and those that were 2½-inch were in the same condition as those in the 2¼."

There is other testimony that in grading the 2¼-inch apples the same care was taken as in grad-

ing the 2½-inch apples, which defendant accepted without complaint. As to the effect on the condition or grade of these apples which resulted from defendant's delay in picking up the 2¼-inch apples, among other testimony is that of Mr. Russell Braman, a disinterested witness, who had been a fruit grower for 21 years and had produced Wealthy apples. In part he testified:

"*Q.* What is the best—what is the general, reasonable way in which those apples are picked, graded and sold and moved to market with respect to the time of handling? If you will give us your opinion, from your experience?

"*A.* Well, the proper way, if you don't sell them immediately to your customer, that is within a week's time, I would say. *    *    *

"*Q.* Then when the apples are picked and graded they should be moved into the market as soon as possible?

"*A.* Yes.

"*Q.* And if not, they should be put in cold storage?

"*A.* That would be the best way.

"*Q.* What happens to the condition of these apples if they are not put in cold storage immediately?

"*A.* Of course, if they are overripe they could break down. Brown spots start in there and you would have to throw them in a different grade. *    *    * It is possible that graded apples permitted to set out of cold storage for two or three weeks could get overripe sufficiently to exceed the tolerances which might have been allowed at the time they were graded."

Bruce Veltman, plaintiff's son, testified:

"The 2½-inch apples were moved from the storage rather rapidly. The 2¼-inch apples stayed around for quite a long time. About the condition of the apples, I noticed that what ordinary bruises were there from the regular handling did develop through

the course of time when they were sitting there in the storage and the apples had brown spots on them after quite a number of days in the storage. I know there were as many as 400 bushels of apples in the storage at one time. That is, 400 bushels of 2¼-inch apples after the 380 bushels of 2½-inch apples had been taken away."

Defendant sought to meet the case made by plaintiff's witnesses by testimony claimed to have established as a fact that at the time the 2¼-inch apples were packed in defendant's crates they were not U. S. No. 1 grade. In the main the witnesses to that effect consisted of defendant Alexander Mallick; Mr. Sam Haddad, who purchased the apples for defendant; Mr. Wesley Rau, an inspector from the marketing enforcement bureau of the Michigan department of agriculture; and Mr. Homer Patrick, an inspector connected with the same department and who for eight years had been a Federal State inspector.

As noted above, the inspection, which resulted in the 2¼-inch apples being rejected by these inspectors as not being grade U. S. No. 1, was not made until many days or weeks after plaintiff had graded and crated the apples, and after they had been picked up by defendant and conveyed in his truck to his place of business in Grand Rapids or to Ionia for cold storage. The inspection by Mr. Rau was by examination of six crates on October 3d, and it is quite impossible to determine from the record whether these six crates contained apples which were first graded and crated by plaintiff or from a later lot. The inspection by Mr. Patrick was not made until October 14th after the apples had been placed in cold storage in Ionia. It seems to be agreed that the bruising or deterioration of apples after once graded affects only the "condition" of the apples but not the grade. Notwithstanding this, the bruised

condition found by these inspectors was used as an
element in the inspection. Mr. Rau testified as fol-
lows:

"*Q.* Now, Mr. Rau, how may crates of apples did
you inspect that day?

"*A.* Six, I think.    *    *    *

"*Q.* And these six samples that were picked, what
defects did you find in the apples?

"*A.* Well, there was scab and some stings, open
stings on some, and *some bruise* and some worm
damage."

The report made of Mr. Patrick's inspection shows
as to defects he found "chiefly rust, scab, limb rubs,
*bruises,* cracks and *shriveled* apples." Upon being
asked what caused the bruises and other conditions
which resulted in these apples failing to grade U. S.
No. 1, Patrick testified: "Well, some of it I think
was rough handling; other was disease, insects, limb
rubs." Concerning the shriveled condition of these
apples when inspected by Mr. Patrick, the follow-
ing from the testimony of Mr. Klooster is some-
what important. He testified:

"*Q.* If the apples that Mr. Veltman packed in
crates on the 9th day of September remained in the
crates on his farm for three weeks, if they were prop-
erly graded as U. S. No. 1, would they still be U. S.
No. 1 at the end of three weeks?

"*A.* Well, he had practically outdoor storage
there. It certainly would not improve the appear-
ance of the apple.

"*Q.* That affects the condition?

"*A.* Yes, it would cause shriveling and shrink-
ing."

Defendant stresses the following from Mr. Rau's
testimony:

"*Q.* Now, are scabs or worms or these open insect
stings, the type of a defect that will result from a de-
lay in storing apples?

"*A.* No.

"*Q.* Are those defects that are on the apple before they are even picked from the tree?

"*A.* Yes, that is right.

"*Q.* And were these defects of sufficient amount to bring this above the tolerances permitted and make it therefore below the grade declared here as U. S. No. 1?

"*A.* That is right.

"*Q.* Now, Mr. Rau, as a result of the inspection you made on October 3d, could these apples at any time have been U. S. No. 1 apples?

"*A.* No, not what we found in them."

But the foregoing is somewhat qualified by Mr. Rau's testimony which immediately followed:

"*Q.* I would like to ask you, Mr. Rau, whether or not Early Wealthy apples which are picked on the 9th day of September and graded on the 15th day of September and inspected after transportation and inspected on the 3d day of October, on which date they are found to be below a U. S. No. 1 grade, could those apples at any time before that have been U. S. No. 1 apples?

"*A.* Not according to my inspection on this load here. That is rather lengthy and a hard question to answer because you—I don't know, your Honor, whether I could answer that question in that way or not. That would be—put it this way, if they were good, firm and not overripe apples in a good storage, reasonable storage, I would say if they were No. 1's on the day they were packed, they should be No. 1's on the same day we inspected them. * * * Well, as I heard one of the witnesses testify, weather conditions and place and likes of that would enter into the picture. And I don't know the weather. I don't remember the weather, and so it would be hard to really say [what the other witness meant by proper storage]."

The record contains uncontradicted testimony that during the early period of picking these apples

the temperature was in the high 70's and ran into the 80's; and it "went over 80° a few days between September 15th and September 25th."

Defendant's witness, Sam Haddad, was present when Patrick inspected these apples and upon being asked on direct examination, "What type of apples" Patrick claimed were defective, Haddad answered: "There were scabs and stings and *bruises* and scars and cracks." The testimony of inspector Patrick was quite in accord with that of Mr. Rau. In part Mr. Patrick testified:

"They (the 2¼-inch apples) failed to grade U. S. No. 1.   *   *   *   Because of damage and serious damage and defects.

"*Q.* What would cause that in your judgment?
*   *   *

"*A.* Well, some of it I think was *rough handling*; other was disease, insects, limb rubs.

"*Q.* In your judgment, based upon your examination of these apples, were those apples U. S. No. 1 apples on September 15, 1947?

"*A.* No."

One of defendant's employees testified that shortly after October 3d he and his brother regraded and repacked "the 249 or 189 crates of apples,   *   *   *   I grade them by hand.   *   *   *   We didn't keep track of how many were wormy or scabs but we lost 30 crates which included *bruises* too. I don't know how many were bruised."

Both defendant Mallick and witness Haddad gave testimony as to the claimed defective condition of the apples after they came into defendant's possession. From the testimony thus far noted it clearly appears that there was a conflict of testimony as to the controlling issue—*i. e.*: Were the 2¼-inch apples when packed in defendant's crates U. S. No. 1 grade? In reviewing the testimony and passing upon the above issue the trial judge quite properly called at-

tention to the fact that the 2½-inch apples accepted by defendant without complaint as to defects and the 2¼-inch apples involved in this suit were sorted, graded and packed by the same process, at the same time, by the same group of people, whose manner of performing the work had been approvingly observed by defendant and an apple inspector; but notwithstanding this defendant now contends that the 2¼-inch apples were not U. S. No. 1 grade at the time they were packed in defendant's crates.

As bearing somewhat upon the above phase of this case there is testimony both by plaintiff and his son, Orville Veltman, that when on September 26th an employee of defendant came to pick up the 400 crates of these 2¼-inch apples, the employee said: " 'Well, I want those apples that were here a couple of weeks that I should have got two weeks ago.' " The employee when on the witness stand denied making the statement above attributed to him.

It is also disclosed by the record that between the time when these apples were purchased by defendant and subsequently rejected there was a pronounced decline in the market condition and a substantial reduction in the price of apples.

We forego further review of the testimony which on the controlling question was in pronounced conflict. After seeing and hearing the witnesses and considering their testimony, the trial judge in his opinion said:

"Under the testimony and the circumstances of this case  *  *  *  plaintiff has definitely established by a strong preponderance of the evidence in the case his right to recover here against the defendant in the full amount of $1,816, the claim of plaintiff."

The following, from one of our former decisions and in substance found in many of our other decisions, is particularly applicable to the instant case:

" 'We have repeatedly said in cases tried without a jury that the trial judge is the trier of the facts and may give such weight to the testimony as in his opinion it is entitled to. In such cases we do not reverse unless the evidence clearly preponderates in the opposite direction.' " *School District of the City of Ionia, for use and benefit of Employers' Liability Assurance Co.,* v. *Dadd,* 308 Mich. 220.

After a careful review of this record we are of the opinion that it was correctly decided by the trial judge. The judgment entered in the circuit court is affirmed, with costs to appellee.

BUSHNELL, C. J., and SHARPE, BOYLES, REID, DETHMERS, BUTZEL, and CARR, JJ., concurred.